**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

NATIONAL FINANCIAL SERVICES,

No. 95-2796

INCORPORATED, a corporation;
ROBERT J. SMITH, individually and as
an officer of said corporation;
N. FRANK LANOCHA,
Defendants-Appellants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-91-226-L)

Argued: May 8, 1996

Decided: October 11, 1996

Before RUSSELL and ERVIN, Circuit Judges, and NORTON,
United States District Judge for the District of South Carolina,
sitting by designation.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in
which Judge Russell and Judge Norton joined.

_____

**COUNSEL**

**ARGUED:** Matthew Scott Sturtz, Joseph William Hovermill, MILES
& STOCKRIDGE, P.C., Baltimore, Maryland, for Appellants. Jac-

queline H. Eagle, Office of Consumer Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Christopher W. Keller, Thomas E. Kane, Division of Credit Practices, FEDERAL TRADE COMMISSION, Washington, D.C., for Appellee.

_____

**OPINION**

ERVIN, Circuit Judge:

National Financial Services, Inc. (NFS), Robert J. Smith, and N. Frank Lanocha are debt collectors who, primarily on behalf of companies selling magazine subscriptions, send out computer-generated dunning letters en masse. They appeal the imposition of civil penalties for violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq., and the Federal Trade Commission Act (FTCA), 15 U.S.C. §§ 45(m) and 53(b). The appellants object, first to the grant of summary judgment against them, contending that they raised material issues of fact for trial. Second, they argue that the district court abused its discretion when it determined that NFS and Smith must pay a civil penalty of $500,000 and that Lanocha must pay $50,000. We affirm.

I. Background

NFS is a collection agency primarily serving magazine subscription clearinghouses. According to Robert J. Smith, the owner and president of NFS, the company handled about 2,200,000 accounts each year in 1986 and 1987. About half of NFS's accounts were placed by American Family Publishers (AFP). Every few weeks, AFP would provide NFS with magnetic tapes containing the names, addresses, and unpaid balances--averaging about $20.00--for 5,000 to 70,000 delinquent accounts. NFS fed that data into its computer, which merged the customer information onto pre-printed collection notices, or "dunning letters".

The text of the letters, prepared by Smith, varied over time. A representative letter examined by the district court specified a deadline for payment, and then stated:

2

[I]t is now being processed by our NATIONWIDE COL-LECTION AGENCY DIVISION to enforce IMMEDIATE PAYMENT from you. Notification is hereby given that the date assigned above is your DEADLINE.

If you fail to pay your bill by the DEADLINE, we will then take the appropriate action. Remember your attorney will also want to be paid. An envelope is enclosed for your pay-ment.

Our AUDIOTEX telecommunications system remain on line to answer your inquiry, twenty-four hours per day, seven days per week. Call anytime (301) 366-3217.

YOUR ACCOUNT WILL BE TRANSFERRED TO AN ATTORNEY IF IT IS UNPAID AFTER THE DEADLINE DATE!!!

The back of the letter included a "validation notice," which read:

If you do not dispute the validity of this debt or any portion of it within 30 days after receipt of this notice, we will assume it is valid. If you dispute the validity of this debt or any portion of it in writing within 30 days we will mail veri-fication of the debt to you. At your written request, within the 30 days, we will provide you with the name and address of the original creditor if different from the current creditor.

Those consumers who contested the amount owed were removed from the NFS system.

Customers who did not pay after receiving a series of the NFS "deadline notices"--about 85% of the accounts--received one or more form letters on the letterhead of "N. Frank Lanocha, Attorney at Law." Lanocha was selected by Smith in response to AFP's sug-gestion that attorney letterhead notices would increase collection rates. Lanocha, who had no separate agreement with AFP relating to collection letters, prepared the text and gave a copy to Smith. Smith would feed the "attorney at law" dunning text into the NFS computer,

3

merge it with the AFP data, and mail out the letters. Several versions of these letters were sent on AFP accounts between 1983 and 1991. Four "Attorney at Law" letters contained in the record included the following text:

> PLEASE NOTE I AM THE COLLECTION ATTORNEY WHO REPRESENTS AMERICAN FAMILY PUBLISH-ERS. I HAVE THE AUTHORITY TO SEE THAT SUIT IS FILED AGAINST YOU IN THIS MATTER. . . . UNLESS THIS PAYMENT IS RECEIVED IN THIS OFFICE WITHIN FIVE DAYS OF THE DATE OF THIS NOTICE, I WILL BE COMPELLED TO CONSIDER THE USE OF THE LEGAL REMEDIES THAT MAY BE AVAILABLE TO EFFECT COLLECTION. . . .

> * * * *

> I am the collection attorney hired by American Family Pub-lishers to protect their interests in the United States. I have filed suits and obtained judgments on small balance accounts just like yours. My authority to collect these accounts includes the enforcement of judgments . . .

> * * * *

> LAW OFFICES - DEMAND NOTICE. YOU HAVE TEN DAYS TO PAY YOUR BILL IN FULL. CONTINUED FAILURE TO PAY WILL RESULT IN FURTHER COL-LECTION ACTIVITY. ONLY YOUR IMMEDIATE PAY-MENT WILL STOP FURTHER LEGAL ACTION.

> * * * *

> YOUR ACCOUNT MAY NOW BE FOR SALE. . . . ACCOUNTS, LIKE YOURS, THAT ARE SOLD . . . RUN THE RISK THAT THE BUYER WILL FILE SUIT AGAINST THEM. JUDGMENT CAN RESULT IN ASSETS BEING SEIZED. INSTRUCTIONS HAVE BEEN GIVEN TO TAKE ANY ACTION, THAT IS LEGAL, TO ENFORCE PAYMENT.

4

The notices were not signed by Lanocha. Nor did he receive or review the information on the AFP computer tapes--either in general or in relation to any particular account. Lanocha did not read or review the letters prepared by the NFS computers under his name. He did not have a list of customers who received his letters. According to AFP's Vice President of Finance, Stephen F. McCarthy, Lanocha did not confer with AFP regarding the text of the letters and, in fact, had no contact with AFP regarding any aspect of the collection activities from 1983 until 1990. McCarthy declared that AFP never paid Lanocha any money for any purpose. Lanocha did not forward payments or reports on collections to AFP. Rather, NFS paid AFP half of each account collected and, in its monthly performance reports to AFP, made no distinction between payments received from the NFS letters and payments from the "attorney at law" collections.

Although Lanocha filed fifteen lawsuits in 1984, he did not file any lawsuits during the 1989 to 1991 period of time covered by this prosecution.

Smith and Lanocha have had a long history of dealings with the Federal Trade Commission (FTC). In February 1980, in response to consumer complaints, the FTC sent NFS an access letter seeking to review the company's debt collection practices. After Smith and Lanocha provided information and documents, the FTC recommended the elimination of references to "legal proceedings," "legal costs," "court costs," and the possibility that NFS and Lanocha would "recommend court action." The FTC found that the letters created a false impression that NFS played a role in whether a consumer was sued and misrepresented Lanocha's role in the process. In September 1981, Smith wrote to the FTC that the attorney letters would be discontinued, and enclosed revised collection notices. The FTC responded that the new notices still misrepresented the intent to sue, and asked NFS to immediately implement the changes it suggested. Smith responded that NFS would not purchase new forms until March 1992. The FTC began an investigation in 1987. On January 29, 1990, the Commission informed counsel for Smith and Lanocha that it was preparing to recommend a complaint be issued, and offered an opportunity to discuss settlement. The case was subsequently referred to the Department of Justice. On January 25, 1991, the Government filed an action for civil penalties and injunctive relief against NFS, Smith and

5

Lanocha, alleging violations of 15 U.S.C. §§ 1692e(5), 1692e(10), and 1692g. The defendants moved for summary judgment and, in turn, the government moved for partial summary judgment. The district court granted the government's motion, finding that the defendants had improperly threatened consumers with legal action (under § 1692e(5)), had made false threats to sue (under § 1692e(10)), and had sent notices containing contradictory information about a consumer's time to dispute the debt (under § 1692g). The court then ordered the parties to submit memoranda on the appropriate remedies and what, if any, issues remained for a jury.

In response, the government asked for an injunction and at least $1.5 million in civil penalties. The government also moved to reopen discovery on remedies, and discovery was reopened for sixty days. The government conducted additional discovery during that time, but the defendants did not. The defendants also refused to provide any financial information until after the court determined that they had the requisite knowledge to support the assessment of penalties. The government moved to compel, and the court granted the motion.

On December 20, 1993, the court entered an order of permanent injunction against the defendants. On November 18, 1994, a hearing was conducted on the assessment of penalties. On July 20, 1995, the court found that the defendants' actions were deliberate, repeated, and numerous; that the violations produced substantial benefits to the defendants; and that the conduct constituted violations of Lanocha's professional responsibilities. Accordingly, the court imposed civil penalties of $500,000 on Smith and NFS and $50,000 on Lanocha.

II. Summary Judgment

The defendants contend that they were entitled to a jury trial to resolve disputed issues of material fact regarding whether their notices improperly threatened debtors under #8E8E # 1692e(5) and (10), and whether the debt validation notices were effectively conveyed under § 1692g. We review the district court's grant of summary judgment de novo. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996). Summary judgments are appropriate in those cases where there is no genuine dispute as to a material fact and it appears that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P.

6

56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). On summary judgment, any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986). However, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. <u>Id</u> at 587; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

A. <u>15 U.S.C. §§ 1692e(5), (10)</u>

The FDCPA protects consumers from abusive and deceptive practices by debt collectors, and protects non-abusive debt collectors from competitive disadvantage. 15 U.S.C. § 1692e. Section 1692e forbids the use of "any false, deceptive, or misleading representation or means" in debt collection, and provides a non-exhaustive list of prohibited conduct, including:

> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>
> \* \* \* \*
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

Thus, collection notices violate § 1692e(5) if (1) a debtor would reasonably believe that the notices threaten legal action; and (2) the debt collector does not intend to take legal action. Most courts that have considered the issue have applied a "least sophisticated debtor" standard in evaluating violations of § 1692e(5). <u>See Russell v. Equifax A.R.S.</u>, 74 F.3d 30, 34 (2nd Cir. 1996); <u>Smith v. Transworld Systems, Inc.</u>, 953 F.2d 1025, 1028 (6th Cir. 1992); <u>Graziano v. Harrison</u>, 950 F.2d 107, 111 (3d Cir. 1991); <u>Jeter v. Credit Bureau</u>, 760 F.2d 1168, 1172, 75 (11th Cir. 1985) (deciding that Congress intended FDCPA to apply same standard as FTC Act, which was enacted to protect unsophisticated consumers, not only reasonable consumers who could

7

otherwise protect themselves in the market place); <u>Baker v. G.C. Services Corp.</u>, 677 F.2d 775, 778 (9th Cir. 1982); <u>Dutton v. Wolhar</u>, 809 F. Supp. 1130, 1141 (D. Del. 1992) (applying least sophisticated debtor standard to section 1692e(10) claim); <u>Wright v. Credit Bureau of Georgia, Inc.</u>, 555 F. Supp. 1005, 1007 (N.D. Ga. 1982) (adopting "least sophisticated" reader test of the FTCA rather than the "reasonable consumer" test developed under the Truth in Lending Act); <u>Bingham v. Collection Bureau, Inc.</u>, 505 F. Supp. 864, 870 (D.N.D. 1981) (least sophisticated reader); <u>see also Bustamante v. First Fed. Sav. & Loan Ass'n</u>, 619 F.2d 360, 364 (5th Cir. 1980) (applying "reasonable consumer" standard includes protection for the "unsophisticated or uneducated consumer"). <u>But see Swanson v. Southern Oregon Credit Service, Inc.</u>, 869 F.2d 1222, 1227 (9th Cir. 1988); <u>Blackwell v. Professional Business Services, of Georgia, Inc.</u>, 526 F. Supp. 535, 538 (N.D. Ga. 1981) (applying "reasonable consumer" test). In the instant case, the district court preferred the "least sophisticated debtor" standard.**1** As the Second Circuit has explained, evaluating debt collection practices with an eye to the"least sophisticated consumer" comports with basic consumer-protection principles:

> The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd. This standard is consistent with the norms that courts have traditionally applied in consumer-protection law. More than fifty years ago, the Supreme Court noted that,

> [t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced. There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious.

_____

**1** However, the court also found that the appellants' notices violated the FDCPA when viewed under a slightly higher, "reasonable debtor" standard.

8

Clomon v. Jackson, 988 F.2d 1314, 1318 (2nd Cir. 1983) (quoting Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 116 (1937)). While protecting naive consumers, the standard also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care. Id. at 1319.

The district court first examined the collection notices to assess whether they threatened legal action. Looking at the NFS notices, the district court found that both a reasonable and the "least sophisticated" debtor would perceive the language, "YOUR ACCOUNT WILL BE TRANSFERRED TO AN ATTORNEY IF IT IS UNPAID AFTER THE DEADLINE DATE," to mean that the account would receive different treatment from an attorney than it did from NFS. Because to most consumers, the relevant distinction between a collection agency and an attorney is the ability to sue, the court reasoned that the debtor would understand the disparate treatment to be the institution of suit. Similarly, the court found that the language, "remember your attorney will want to be paid," implies that the consumer will need a lawyer to defend himself or herself against a debt collection law suit.

Turning to the Lanocha letterhead notices, the district court concluded that they also threatened legal action.

The court further found that NFS and Smith had no intention of taking legal action at the time the notices were sent, because NFS had no internal procedure to get authorization to file suit. "In fact," the court found, based on Smith's testimony, "NFS repeatedly conveyed its belief in the impracticality of filing suit when pressed by AFP to do so." Although there occurred some discussion with AFP regarding the general merits and mechanics of instituting legal actions, such conversations never concerned any particular debtor. Thus, the district court concluded that NFS's notices violated section 1692e(5) of the FDCPA.

Similarly, the court further found that Lanocha did not intend to take legal action against any debtor who received one of his letters. Lanocha had filed no lawsuits during the period of time covered by

9

this lawsuit.[2] Although Lanocha had had discussions with AFP regarding the mechanics of suing on a large-scale, and actually investigated various state small-claims procedures, Lanocha admitted that he had concluded that such an endeavor was not feasible. No evidence showed that Lanocha discussed with AFP which accounts warranted legal action. Thus, the district court concluded that Lanocha's letter also violated section 1692e(5) of the FDCPA.

On appeal, the defendants argue that their notices did not threaten legal action because they never state that a suit "will be" filed, or "is going to be" filed. All of their statements were open to interpretation, they contend. With regard to the NFS notices, they argue, for example, that referring a matter to an attorney does not necessarily imply that a legal action will be filed, but merely implies that the lawyer will consider whether to institute a proceeding against a consumer.[3] The defendants aver that a reasonable consumer might conclude that he would not be sued because of the small balance involved.[4] Concerning the statement, "remember your attorney will want to be paid," the defendants assert that they simply stated an irrefutable fact: a debtor weighing the risks of nonpayment may need to consult counsel, who will charge a fee. And if the debtor is sued, he or she will incur legal fees. While the defendants are literally correct, we do not believe that any consumer could reasonably believe that NFS intended to provide a public service by informing him about the basic functions and fee requirements of attorneys.

With regard to the Lanocha letters, the defendants argue that they

_____

[2] Lanocha filed actions against fifteen debtors in 1984, but was unable to recall whether they resulted in payment.

[3] Throughout their brief, the defendants seem to argue that they did not threaten to sue, rather they threatened to consider to sue. In light of the fact that no suit was ever filed, and Lanocha never reviewed any file, that threat was also false.

[4] This argument does not help the defendants, because it implies that although a suit was threatened, a consumer might disregard it in realization that the small balance makes a suit unlikely. In fact, some of the language in the Lanocha letters seems to be aimed at preventing that reasonable conclusion. For example, "I have filed suits and obtained judgments on small balance accounts just like yours."

never say that a suit "will be" filed, or "is going to be" filed, but simply that Lanocha had the authority to do so. Their argument continues, he simply states that he will "consider" bringing a suit, not that he will do so. The statement, "only your immediate payment will stop further legal action," was used by Lanocha only after AFP advised him that it wanted to sue all the debtors across the country. And Lanocha's statements that, "I have filed suits . . ." and "I will consider the use of legal remedies . . ." were merely factual statements of the common tasks performed by attorneys. Based on these assertions, they contend that this disagreement as to the meaning of the language of the notices is a question of fact for the jury. We disagree. The letters connote that a real attorney, acting like an attorney, has considered the debtor's file and concluded in his professional judgment that the debtor is a candidate for legal action. Using the attorney language conveys authority, instills fear in the debtor, and escalates the consequences.**5**

The defendants also insist that the letters were sent with the intention of bringing suit. They protest that NFS was simply a conduit for the desires of its client, and that it reasonably believed that AFP might take legal action against the debtors. AFP repeatedly stated its desire to sue the delinquent customers. Discussions between AFP and Smith and AFP and Lanocha concerned filing thousands of lawsuits. At one point, AFP indicated that it intended to sue all of the debtors. The defendants concede that NFS never intended to file suit, and indeed could not file suit against AFP's debtors. But the defendants argue that NFS was merely conveying the intentions of its client, AFP. A jury could reasonably conclude, the argument runs, that NFS reason-

_____

**5** Because we affirm the district court's finding that Lanocha violated § 1692e(5) and (10), we do not address the alternative ground that he violated § 1692e(3), which prohibits "[t]he false representation or implication that any individual is an attorney or that any communication is from an attorney." See Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996) (holding that mass-produced dunning letters bearing facsimile of attorney's signature created false and misleading impression that communications were "from" attorney); Clomon v. Jackson , 988 F.2d 1314 (2d Cir. 1993) (where attorney had no direct personal involvement in the mailing of collection letters, use of his letterhead and facsimile of his signature violated the FDCPA).

ably believed that lawsuits might be instituted if the account was turned over to Lanocha. Similarly, the defendants aver that a jury could reasonably find that Lanocha believed that AFP intended to file suit against some or all of its debtors, because he had discussions with AFP regarding the mechanics of filing suits on small balances in various states.

The fact that Lanocha filed 15 suits in 1984 (before the period covered by this lawsuit) means nothing in the context of the literally millions of notices sent out for years afterward. Lanocha had no real involvement with sending the letters. He never reviewed the files and he wasn't involved in deciding when or to whom letters were sent. He exercised no judgment with regard to the files, he didn't see the letters, didn't sign them, and didn't even know their identities. Likewise, even if Lanocha tossed around the idea with AFP of singling out some debtors for suit in particular regions in order to make examples out of them, there is no evidence that a determination to sue was actually made or even considered with regard to any of the millions of customers who received the N. Frank Lanocha correspondence. And even if it were remotely credible that AFP intended to sue every debtor, there is no evidence that AFP ever took any step toward that goal. An inchoate "intention" to someday sue "all debtors" cannot establish blanket justification for six years of sending millions of threatening letters. There must be a particularized intention to sue a particular debtor if he or she does not pay.

Smith knew that filing lawsuits was not viable, and knew that neither NFS, nor Lanocha, nor AFP would in fact file lawsuits against the customers receiving the notices. Likewise, Lanocha knew that filing suit would be impracticable and burdensome. He knew that AFP had no intention, because he in fact filed no suits.

With these arguments, the defendants ask this court to adopt a hyper-literal approach which ignores the ordinary connotations and implications of language as it is used in the real world. We decline to do so. We concur with the district court's analysis of the notices, and conclude that the defendants' notices threatened to take legal action which they had no intention of taking, in violation of § 1692e(5). No reasonable juror could conclude that those statements were not meant to make debtors fear that they would be sued. To find

12

otherwise would undermine the consumer protection goals of the statute and permit debt collectors to get away with accomplishing the threat under the flimsy disguise of "statements of fact." As we have said before in the context of § 1692g, "[t]here are numerous and ingenious ways of circumventing [the law] under a cover of technical compliance. [The defendants have] devised one such way, and we think that to uphold it would strip the statute of its meaning." Miller v. Payco-General American Credits, Inc., 943 F.2d 482, 485 (4th Cir. 1991). Here, we have an obvious intention to make debtors afraid that they would be sued, an effective tactic no doubt, but one which violates the law.

Because we concur with the district court's finding that the notices falsely threatened legal action, we concur with the court's conclusion that the defendants also violated § 1692e(10), which prohibits "the use of any false representation or deceptive means to collect or attempt to collect any debt . . . ." Courts have consistently found that falsely representing that unpaid debts would be referred to an attorney for immediate legal action is a deceptive practice. Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1175 (11th Cir. 1985). Reference to an attorney in a letter to a debtor is a false threat of suit where the attorney has not been retained to collect a particular debt and has reached no determination that a suit would be filed if payment is not made. Masuda v. Thomas Richards & Co., 759 F. Supp. 1456, 1459-61 (C.D. Cal. 1991). The false representation that a lawyer may be called in may unjustifiably frighten an unsophisticated consumer into paying a debt that he or she does not owe. Id. Of course, the test is the capacity of the statement to mislead; evidence of actual deception is unnecessary. The district court considered the impact of the defendants' notices on the "least sophisticated consumers," and correctly concluded that the false threats that legal action would be taken also violated § 1692e(10).

B. § 1692g

Section 1692g requires a debt collector to provide, in its initial communication with a consumer or within five days of that time, a debt validation notice informing the consumer of his or her right to dispute the validity of the debt. The statute requires the written notice to include, among other information:

13

a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector.

15 U.S.C. § 1692g(a)(3). To be adequate, the "validation notice" must be placed in such a way to be easily readable, and must be prominent enough to be noticed by an unsophisticated consumer. The notice also must not be overshadowed or contradicted by other messages. The district court held that the NFS deadline notice and two of the Lanocha letterhead notices,[6] violated § 1692g(a) because they either demanded payment in ten days, or demanded "immediate payment." The deadlines--generally ten days from the date of the notice--conflicted with the thirty days allowed in the validation notice itself, which was printed on the back of the form. The court also noted that the bold commanding type of the dunning text overshadowed the smaller, less visible, validation notice printed on the back in small type and light grey ink.

The district court's decision was compelled by Miller v. Payco-General American Credits, Inc., 943 F.2d at 484.

The defendants raise no issue of fact concerning the district court's determination that the conflicting time requirements in the text of the notice and the validation notice violate the Act.

III. Civil Penalties

The FDCPA provides for enforcement as though it were an FTC rule. 15 U.S.C. § 1692l(a). Thus FDCPA violations can be punished under the Federal Trade Commission Act, which provides that the Government may impose civil penalties of up to $10,000 per each violation on

_____

[6] The district court denied the government's motion for summary judgment with regard to certain other of the Lanocha letters, which the court found did not contain the contradictory language and misleading type disparity.

14

> any person, partnership or corporation which violates any [ ] rule . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.

15 U.S.C. § 45(m)(1)(A). The United States sought civil penalties totalling $1,500,000.

The defendants argue that they had no actual notice that the precise language they were using violated the FDCPA. Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors. A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision. S. Rep. No. 1408, 93rd Cong., 2nd Sess. 4, 1974 U.S.C.C.A.N. 1772. It is undisputed that the defendants were aware of the relevant provisions of the FDCPA and had extensive interaction with the FTC concerning how to comply with it.

The defendants argue that they were entitled to a jury trial on "the disputed question of their state of mind." Smith testified that he did not believe that the notices violated the Act. The defendants concede they knew that the FDCPA prohibited threats of legal action not intended to be taken, but claim that they honestly believed that the NFS letters were compliant, and believed that AFP intended to take legal action. Smith submitted an affidavit attesting that the FTC saw "nothing wrong" with his notices. The FTC did not inform them that the letters violated the Act until three years after the investigation began. Similarly, the defendants argue that there is a genuine issue of material fact about whether Lanocha knowingly violated the Act, and they assert that he honestly believed that his notices accurately reflected AFP's intentions.

Civil penalty assessments are reviewed for abuse of discretion. United States v. Reader's Digest Ass'n, 662 F.2d 955, 969 (3d Cir. 1981).

The district court considered: (1) the good or bad faith of the defendants, (2) the injury to the public, (3) the defendants' ability to pay, (4) the benefits derived from the violations, and (5) the necessity of

15

vindicating the authority of the FTC. F.T.C. v. Hughes, 710 F. Supp. 1524, 1529 (N.D. Tex. 1989).

Addressing the defendants' good faith, the district court found that the defendants' actions were knowing and deliberate. They engaged in multiple violations over many years, knowing that the Act prohibits threats of legal action not intended to be taken. Lanocha admitted that he concluded that a plan to sue all the AFP debtors would be too burdensome, and Smith testified that he was aware of the economic impracticality of filing suit.

The defendants contend that there is abundant evidence of their good faith, including consulting an attorney to ensure their compliance, cooperating with the FTC, compliance with industry standards concerning the validation notices, and relying on the statements by AFP's vice-president that AFP intended to file suit against every debtor.

Turning to injury to the public, the government need not prove actual harm to consumers in order to assess penalties. United States v. Reader's Digest Ass'n Inc., 494 F. Supp. 770 (D. Del. 1980), aff'd, 662 F.2d 955 (3d Cir. 1981), cert. denied, 455 U.S. 908 (1982). Threats of legal action are likely to be intimidating to consumers, and cause distress and anxiety. Stress resulting from false threats of suit has been recognized as a compensable injury in private suits under the FDCPA. See e.g., Carrigan v. Central Adjustment Bureau, 502 F. Supp. 468 (N.D. Ga. 1980). Consumers might elect to pay a debt that they do not owe in order to avoid the threatened lawsuit. The court concluded that the millions of notices sent out bearing the violative language caused significant injury to the public. Injury also could result from the failure to supply proper validation notices adequately advising of the right to challenge a debt.

The government submitted evidence establishing that the defendants sent out millions of notices containing the offending language, including the records of UARCO, a printing company that supplied NFS with many of its debt collection forms, and the declaration of David Dammen, UARCO's district manager. (J.A. 808). From UARCO, NFS purchased nearly 3,000,000 NFS deadline notice forms pre-printed with language the district court found violated the

16

FDCPA, and from 1986 to 1990, it purchased more than 9,000,000 Lanocha Letterhead forms. The government also submitted AFP performance data indicating that NFS mailed millions of notices to consumers whose names were supplied by AFP. (J.A. 771). These figures, which were not disputed by defendants, do not include notices mailed to consumers on other accounts. (J.A. 1149, 1155-58, 1161, 1164-65). The defendants submitted no documentation of how many collection notices were sent and did not challenge UARCO's records. In response to government requests for actual figures regarding the number of notices sent, Smith and Lanocha provided nothing. Their failure to rebut creates an adverse inference. Vodusek v. Bayliner Marine Corp., 71 F.3d 145, 156 (4th Cir. 1995).

Turning to the benefits received by the defendants, the defendants assert that it is "unclear" how much income each defendant earned from the AFP-related collection activities. But they offered no declarations or documents to establish the amounts of income each received.

The FTC Act authorizes a civil penalty of up to $10,000 for each violation of the FDCPA. A separate violation occurs every time a prohibited threat or misrepresentation is made, or each time the required validation notice is not provided. Thus, each of the millions of collection letters that threatened suit was a separate violation of 15 U.S.C. §§ 1692e(5) and (10), and each letter with a defective validation notice was a separate violation of § 1692g. The government requested a penalty of at least $1,500,000. In light of the millions of accounts involved, and the fact that most accounts received more than one letter, the district court would have been within its discretion to impose penalties far greater than $550,000. Although the penalty was larger than in most other FDCPA cases, the large scale of the violations justifies the penalty. Without a real sting, the defendants would be unlikely to be deterred from violating the Act, in light of the substantial profit to be made using aggressive and improper collection practices.

IV.

The district court was correct in finding that the defendants were guilty of violating the applicable laws and did not abuse its discretion

17

in awarding civil penalties in the amounts imposed upon NFS, Smith, and Lanocha. Accordingly, the decision of the district court is

AFFIRMED.

18