Sherri J. GRADISHER, Plaintiff,

v.

CHECK ENFORCEMENT UNIT,
INC., Defendant.

No. 1:00CV401.

United States District Court,
W.D. Michigan,
Southern Division.

April 5, 2002.

Louis R. Lint, Louis R. Lint, PC, Muskegon, MI, Muskegon, O. Randolph Bragg, Horwitz, Horwitz & Associates, Chicago, IL, for Sherri J. Gradisher, on behalf of herself and all others similarly situated, pltf.

Donald L. Payton, Kaufman & Payton, Farmington Hills, MI, Oakland, Gregory I. Thomas, Thomas, DeGrood, Witenoff & Hoffman, Southfield, MI, for Check Enforcement Unit, Inc., deft.

## OPINION

QUIST, District Judge.

Plaintiff, Sherri J. Gradisher ("Gradisher"), sued Defendant, Check Enforcement Unit, Inc. ("CEU"), on behalf of herself and a proposed class alleging that CEU violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692o, and its Michigan counterpart, the Michigan Collection Practices Act, M.C.L. §§ 339.901–.920 and M.C.L. §§ 445.251–.258. By Order dated August 21, 2001, the court certified a class. The court clarified the class membership by separate Order dated January 25, 2002. Gradisher has now moved for partial summary judgment on behalf of herself and the class. She requests a determination that CEU violated the FDCPA. For the reasons stated below, the court concludes that the motion should be granted.

### I. *Facts*

CEU is a Michigan corporation located in Ada, Michigan. CEU's sole business activity is the collection through its Check Operational Procedure of dishonored checks received by area merchants. CEU provides its services through contractual arrangements with various municipalities throughout the state of Michigan. Although CEU provides its services to merchants, it does so in collaboration with the municipalities' law enforcement agencies. Merchants enroll in CEU's Check Operational Procedure by paying CEU an $85 registration fee. When a check received by a participating merchant is dishonored, the check is forwarded to CEU by the merchant's bank or financial institution. After CEU receives the dishonored check, it sends out a series of notices and letters to the check writer printed on the letterhead of the municipality's law enforcement agency. These notices and letters demand payment of the check amount, bank fees, and a fee payable to the municipality.

On or about December 13, 1996, CEU entered into a contract (the "Contract") with Muskegon County (the "County") to provide services to the County for the processing and recovery of dishonored checks and investigation of dishonored check violations. The Contract provides that CEU is an independent contractor and

shall process, recover, investigate, and assist in the enforcement of dishonored checks in violation of applicable state laws or township ordinances as submitted by merchants, businesses, and citizens for violations occurring with these areas of the County not served by municipal police departments, pursuant to the terms and conditions stated with this Contract and for the terms as specified herein.

(Contract ¶ 1, Pl.'s Statement of Material Facts ("PSMF") Ex. G.)

Pursuant to the Contract, when a check payable to a participating merchant is dishonored, the check is forwarded directly to CEU. CEU then sends out a series of notices or letters at fifteen day intervals to the check writer using the letterhead and envelopes of the Office of the Sheriff of Muskegon County ("Sheriff's Department") supplied by the Sheriff's Department. The first notice, entitled "Due Process Notice", demands two separate payments by cashiers check or money order, one for the amount of the dishonored check plus bank fees payable to the merchant, and the other for the $25 Government Assessment Fee payable to the County. The Due Process Notice is used to establish the presumption of the check writer's intent to defraud under the County's check violation ordinance through the check writer's failure to pay the amounts due within five days. The second notice, entitled "Final Notice", is sent out if the check writer fails to respond to the Due Process Notice. The Final Notice repeats the demand for payment of the amounts

set forth in the Due Process Notice and advises the check writer that he or she has violated criminal law. The third notice, entitled "Interview Notice", is sent out if there is no response to the Final Notice. The Interview Notice reiterates the warning that the check writer is in violation of the criminal law and instructs the check writer to report to the Sheriff's Department for an interview on the check complaint. If the check writer pays the amounts demanded in the Due Process Notice and Final Notice at any point in the process, no further action is taken, and CEU sends the payment for the amount of the check and bank fee to the merchant and sends the Government Assessment Fee to the County. The County retains $3.50 of the $25 fee and sends $21.50 to CEU.

The Sheriff's Department does not oversee or supervise the employees or activities of CEU. In general, CEU does not provide information regarding dishonored checks to the Sheriff's Department until after the three notices have been sent and payment has not been received. Prior to that time the dishonored check is not a criminal matter. The dishonored check becomes a criminal matter only after the Sheriff's Department receives the information from CEU and assigns a complaint number to the matter.

On June 16, 1999, CEU sent a Due Process Notice to Gradisher regarding check # 5441, which she wrote to Doug Born's Smokehouse in the amount of $81.30. The Due Process notice stated that the check was returned for insufficient funds, resulting in a violation of law. The Due Process notice demanded payment by cashiers check or money order of $81.30 plus a bank fee of $4.00 to Doug Born's Smokehouse and payment of the $25 Government Assessment Fee by money order payable to the County. On June

30, 1999, CEU sent Gradisher a Final Notice regarding check # 5441, which repeated the demand for the two payments set forth in the Due Process Notice and informed her that she was in violation of criminal law. On July 14, 1999, CEU mailed Gradisher an Interview Notice requesting her to report to the Muskegon County Sheriff Department on August 4, 1999. On July 28, 1999, CEU sent a letter to Gradisher on CEU's own letterhead returning a personal check to Gradisher in payment of the dishonored check and instructing Gradisher to send two separate cashiers checks or money orders. The Sheriff's Department never received a complaint regarding Gradisher, was not aware of Gradisher, never assigned a complaint number regarding her returned check, and never took any action regarding her returned check.

CEU has sent Due Process Notices, Final Notices, and Interview Notices to over 5,000 Michigan residents. CEU sent Due Process Notices, Final Notices, and Interview Notices on the letterhead of the Office of the Sheriff, Muskegon County to the members of the class—approximately 607 persons—between June 2, 1999, and June 2, 2000.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A

dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III. *Discussion*

■ In her motion for partial summary judgment, Gradisher requests that the court determine that CEU violated the FDCPA by: (A) failing to provide a debt validation notice within five days of its initial communication in violation of 15 U.S.C. § 1692g(a); (B) failing to provide the debt collection warning in the Due Process Notice, the Final Notice, the Interview Notice, and the letter from CEU as required by 15 U.S.C. § 1692e(11); (C) impersonating the Muskegon County Office of the Sheriff in violation of 15 U.S.C. § 1692e(1), (9), and (14); (D) threatening to take an action which cannot legally be taken or was not intended to be taken by the debt collector in violation of 15 U.S.C. § 1692e(4) and (5); (E) attempting to collect illegal fees in violation of 15 U.S.C. §§ 1692e(2)(A) and 1692f(1); and (F) using a false representation or deceptive means to collect or attempt to collect a debt in violation of 15 U.S.C. § 1692e(10).[1]

---

1. The court has already determined that CEU is a debt collector if Gradisher wrote her check for personal, family, or household purposes. Gradisher alleged in paragraph 7 of her verified complaint that her check · was written for personal, family, or household purposes. (Compl.¶ 7.) A party's allegation in a verified pleading is sufficient to satisfy that

party's burden on a motion for summary judgment. *Smith v. Campbell,* 250 F.3d 1032, 1036 (6th Cir.2001). Here, Gradisher's verified allegation is not contradicted by any evidence in the record. Accordingly, the court concludes that Gradisher has established her burden of proving that the debt was for personal, family, or household purposes.

The FDCPA was enacted "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA protects consumers from abusive debt practices by requiring debt collectors to notify consumers of their rights under the FDCPA and by eliminating unfair practices "such as late-night telephone calls, false representations, and embarrassing communications." *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 398 (6th Cir.1998). *See also Wright v. Fin. Serv. of Norwalk, Inc.,* 22 F.3d 647, 650 (6th Cir.1994)("In outlining the need for passage of the FDCPA, the Senate declared that debt collection abuse was 'a widespread and serious national problem.' ")(citing S.Rep. No. 382, 95th Cong., 1st Sess. 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696). In determining whether a debt collector has violated the FDCPA, courts in the Sixth Circuit apply the "least sophisticated consumer" standard. *Smith v. Transworld Sys., Inc.,* 953 F.2d 1025, 1028 (6th Cir.1992). This is an objective standard which focuses upon whether the debt collector's actions would have misled or deceived the least sophisticated consumer. *Id.; Smith v. Computer Credit, Inc.,* 167 F.3d 1052, 1054 (6th Cir.1999)(noting that the standard "is 'lower than simply examining whether particular language would deceive or mislead a reasonable debtor' ")(quoting *Swanson v. S. Or. Credit Serv., Inc.,* 869 F.2d 1222, 1225 (9th Cir.1988)). The court will address each of the alleged violations separately below.

## A. Failure to Provide Validation Notice

Pursuant to 15 U.S.C. § 1692g, a debt collector must provide a notice to the debtor within five days after the initial communication, unless the notice is contained in the initial communication, stating the following:

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a). A debt collector violates the FDCPA by failing to provide the validation notice to a debtor. *Edwards v. McCormick,* 136 F.Supp.2d 795, 802–03 (S.D.Ohio 2001); *Altergott v. Modern Collection Techniques, Inc.,* No. 93 C 4312, 1994 WL 319229, at *2 (N.D.Ill. June 23, 1994).

Gradisher contends that CEU failed to provide the required validation notice in the Due Process Notice. CEU admits that the Due Process Notice did not contain the exact language required by the statute but contends that it did contain much of the information required, such as the amount of the debt, the name of the creditor, and a telephone number and ad-

dress which Gradisher could use to contact CEU if she wished to dispute the debt. Even if the least sophisticated consumer could have ascertained the amount of the debt and the name of the creditor, the Due Process Notice did not contain the information required in § 1692g(a)(3)-(5). Specifically, the Due Process Notice does not state that the debtor may dispute the validity of the debt by notifying the debt collector in writing within thirty days after receipt of the Due Process Notice, nor does it state that upon written request by the debtor within the thirty-day period, the debt collector will obtain verification of the debt. CEU has failed to cite any case holding that a notice containing similar deficiencies still passes muster under the FDCPA. Therefore, Gradisher is entitled to summary judgment on this claim.[2]

## B. Failure to Provide Debt Collection Warning

██ Gradisher next argues that CEU failed to provide the debt collection warning pursuant to 15 U.S.C. § 1692e(11), which provides that a debt collector violates § 1692e by "fail[ing] to disclose in the initial written communication with the consumer ... that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." The Due Process Notice—the initial written communication from CEU—did not include the warning required by § 1692e(11).

CEU argues that Gradisher is relying on a repealed version of the statute. Prior to the adoption of an amendment in 1996, the statute required a debt collector to

disclose in *all* communications to the debtor that the debt collector was attempting to collect a debt and any information obtained would be used for that purpose. The 1996 amendment eliminated the requirement of the full warning in all subsequent communications and now only requires subsequent communications to state that the communication is from a debt collector. *See Lewis*, 135 F.3d at 399 n. 9. As CEU concedes, however, the statute still requires the full warning in the initial written communication from the debt collector, and the Due Process Notice did not contain that warning. CEU also asserts that Gradisher's argument regarding CEU's failure to include the debt collection warning is repetitive of her argument regarding CEU's failure to provide the debt validation notice. CEU is wrong, because each omission constitutes a separate violation. *See Woodard v. Online Information Servs.*, 191 F.R.D. 502, 508 (E.D.N.C.2000)(finding separate FDCPA violations under § 1692g and § 1692e(11)). Therefore, Gradisher is entitled to summary judgment on this claim.

## C. Impersonation of Muskegon County Office of the Sheriff

██ Gradisher alleges that CEU violated the FDCPA by impersonating the Muskegon County Office of the Sheriff. The following activities are considered false, deceptive, or misleading representations or actions that violate the FDCPA:

(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the

---

**2.** Even if the Due Process Notice contained the information required by § 1692g(a)(3)-(5), including the notice of the debtor's right to dispute the debt within thirty days, the court would still hold that the validation was overshadowed or contradicted by the Final Notice, sent fifteen days after the Due Process Notice. *See Withers v. Eveland*, 988 F.Supp.

942, 947 (E.D.Va.1997). The Final Notice would have confused even the most sophisticated consumer because the language "You have failed to respond to the notice sent to you by the Law Enforcement Processing Center. *You are now in violation of criminal law*," would have been contradictory to the right to dispute the debt within thirty days.

United States or any State, including the use of any badge, uniform, or facsimile thereof.

\* \* \* \* \* \*

(9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval.

\* \* \* \* \* \*

(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.

15 U.S.C. § 1692e(1), (9), (14). Gradisher contends that CEU violated these provisions because CEU's use of the letterhead of the Muskegon County Office of the Sheriff gave the false and misleading impression that the notices were from the Sheriff's Department when they were actually from CEU. In addition, Gradisher contends that CEU violated the FDCPA by failing to disclose its true name.

CEU contends that Gradisher's claim must be rejected because CEU did not falsely represent that it was affiliated with the Muskegon County Office of the Sheriff. Specifically, CEU notes that it was affiliated with the Sheriff's Department because it had a contract with the County, the Undersheriff testified that CEU worked for the Sheriff's Department, and Mac Schrumpf, a CEU employee, also worked for the Sheriff's Department. CEU's notices, however, did not merely represent that CEU was affiliated with or vouched for by the Sheriff's Department. Instead, the Due Process Notice, Final Notice, and Interview Notice all conveyed the impression that they were authorized, created, and sent by the Sheriff's Department without any indication that CEU, an independent contractor of the County, was actually

the entity that generated the notices. This result was accomplished both by using Sheriff's Department letterhead and by omitting any reference to CEU. The fact that CEU had an "affiliation" with the Sheriff's Department is thus irrelevant because CEU's notices created the false impression that the notices were generated by the Sheriff's Department. In this regard, the court concludes that CEU's violation is more appropriately characterized as falling under § 1692e(9) rather than § 1692e(1) because of the nature of the representation. *See Gammon v. GC Servs. Ltd. P'ship*, 27 F.3d 1254, 1257–58 (7th Cir.1994)(finding a violation of § 1692e(1) where the debt collector's statements created the impression of a close connection between the debt collector and federal and state taxing units). Moreover, CEU's notices violated § 1692e(14) because CEU used a name other than its own name. *Hartman v. Meridian Fin. Servs., Inc.*, 191 F.Supp.2d 1031, 1045–46 (W.D.Wis.2002)("Under the FDCPA, a debt collector is obligated to use its own name when corresponding with a consumer."). Summary judgment is also proper on this claim.

### D. False Implication that Nonpayment Will Result in Arrest or Imprisonment

Gradisher's next claim is that CEU violated the FDCPA by implying that Gradisher would be arrested or imprisoned if she failed to pay the debt. Gradisher contends that CEU's notices violated § 1692e (4) and (5), which proscribe:

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

15 U.S.C. § 1692e(4) and (5).

The front side of the Due Process Notice contained the following language:

> This letter notifies you that the following check(s) have been returned from your financial institution as insufficient funds or account closed, which is a violation of law....
>
> Violations of check laws are administered for our department at the Law Enforcement Processing Center. Repayment of the check(s) plus the bank fee and government assessment fee is required....

(Due Process Notice, PSMF Ex. A.) The back side of the Due Process Notice stated:

### WARNING

> A local check law is in effect for the passing of bad checks. The law states that you are required to pay the full amount of the check plus fees ...
>
> * * * * * *

**Failure To Make Payment Can Result In A Warrant For Your Arrest**

(*Id.*) The front side of the Final Notice stated: "You have failed to respond to the notice sent to you by the Law Enforcement Processing Center. *You are now in violation of criminal law.* Immediate payment is necessary in order to comply with the requirements of the law." (Final Notice, PSMF Ex. B.) In addition, the statement "**Failure To Make Payment Can Result In A Criminal Warrant For Your Arrest,**" was printed on both the front and back sides of the notice. (*Id.*) The Interview Notice stated:

> We have been informed by the Law Enforcement Processing Center that you have failed to pay the full value of the check(s) written to a merchant in our jurisdiction and/or the government

assessment fee. You are now in violation of criminal law and/or local ordinances. We have requested that the Law Enforcement Processing Center begin an investigation for the consideration of criminal prosecution.

(Interview Notice, PSMF Ex. C.)

Gradisher claims that the statements in the notices quoted above would have caused the least sophisticated consumer to believe that failure to pay the debt would result in arrest or criminal prosecution when, in fact, CEU did not have the power or authority to take any of those actions or make the determination that Gradisher was in violation of any criminal law. Gradisher argues that the Sheriff's Department, which purportedly sent the notices, never determined that a criminal violation occurred and was never even aware of Gradisher. Gradisher also points out that a returned check does not become a criminal matter until it is turned over to the Sheriff's Department and assigned a complaint number, and it is highly unlikely that criminal charges would be brought because during 2000 the Sheriff's Department brought criminal charges in only three dishonored check cases referred by CEU. CEU responds that it did not violate § 1692e(4) and (5) because all of the statements in its notices were true. CEU points out that a person who delivers a check knowing that there are insufficient funds in the account to cover the check is guilty of a misdemeanor under Michigan law and that prima facie evidence of intent to defraud and of knowledge of insufficient funds is established where the check writer fails to deliver the amount due, together with all costs and fees, within five days after receiving notice that the check has not been paid. *See* M.C.L. §§ 750.131, 750.132. CEU also points out that criminal prosecution is always a possibility because CEU forwards a file to the Sheriff's Department for investigation after the

check writer fails to respond to the second notice and the Sheriff's Department usually sends the file to the prosecutor for review if the check writer fails to respond to the initial notice. Thus, CEU contends, the statements in the notices were merely stating the fact that Gradisher's failure to pay the amount due within five days established a violation of criminal law for which an arrest warrant could have been issued.

In *Davis v. Commercial Check Control, Inc.*, No. 98 C 631, 1999 WL 89556 (N.D.Ill. Feb.16, 1999), the plaintiff received a letter from the debt collector stating, "Various PENAL CODES ALLOW FOR CRIMINAL PROSECUTION when a person KNOWINGLY writes a bad check(s).... We may proceed to file your check with local law enforcement...." The plaintiff claimed that the statements violated § 1692e(4) and (5) because the debt collector did not intend to refer the matter for criminal prosecution and the statements falsely implied that nonpayment would result in arrest or imprisonment. As support for her claim that the debt collector did not intend to refer the check for criminal prosecution, the plaintiff offered evidence showing that the debt collector never or rarely referred check cases for prosecution. The court concluded that the debt collector violated the FDCPA because it did not intend to take the actions identified in letter. In reaching its conclusion, the court relied upon the analysis in *United States v. National Financial Services, Inc.*, 98 F.3d 131 (4th Cir.1996), in which the debt collector sent letters threatening referral to an attorney. The Fourth Circuit stated that a collection notice violates § 1692e(5) if "(1) a debtor would reasonably believe that the notices threaten legal action; and (2) the debt collector does not intend to take legal action." *Nat. Fin. Servs.*, 98 F.3d at 135. With regard to the first factor, National Financial Services argued that the notices did not threaten legal action because they did not say that suit would be filed and statements regarding considerations in a lawsuit, such as the fees an attorney would charge to defend the debtor, simply conveyed true facts. The court rejected the argument, stating, "[w]hile the defendants are literally correct, we do not believe that any consumer could reasonably believe that NFS intended to provide a public service by informing him about the basic functions and fee requirements of attorneys." *Id.* at 137. The court also found that the second element was established because National Financial Services never intended to sue the debtors to whom its letters were sent. The court found the fact that an attorney, Lanocha, had filed fifteen suits for the debt collector in 1984 was irrelevant in light of the millions of notices sent out for years after that time. *Id.* at 138. The court observed:

> Lanocha had no real involvement with sending the letters [on his letterhead]. He never reviewed the files and he wasn't involved in deciding when or to whom letters were sent. He exercised no judgment with regard to the files, he didn't see the letters, didn't sign them, and didn't even know their identities.

*Id.* Applying the *National Financial Services* factors, the *Davis* court first concluded that while the debt collector's statement regarding criminal penalties for writing bad checks was an accurate summary of the law, it was intended to threaten legal action rather than to "provide a public service." *Davis*, 1999 WL 89556, at *6. In addition, the court concluded that the debt collector made empty threats because there was no "particularized intention" regarding a particular debtor as demonstrated by the evidence, which showed that no criminal referrals were made out of a sample of 20,000 files. *Id.*

The facts in this case are similar to, but even more compelling than, those in

*Davis.* Here, CEU's statements regarding violation of criminal law and arrest were not merely statements by a debt collector but were clothed with the authority of the Sheriff's Department. Even a sophisticated debtor would conclude after reading CEU's notices that the Sheriff's Department had determined that the debtor committed a crime and arrest or criminal prosecution was certain to occur if the debt was not paid. In fact, the Sheriff's Department had no involvement with the notices sent by CEU and never made any determination regarding violation of the law or arrest. CEU itself could not make the determination that a debtor violated the law because it had no authority to do so, nor could it cause an arrest warrant to be issued.[3] Moreover, the threats in CEU's notices were not real because at the time the notices were sent, CEU did not have a "particularized intention" regarding a particular debtor and CEU had no way to determine whether arrest or criminal prosecution was even remotely possible. Gradisher has shown that criminal prosecution occurs infrequently on files CEU sends to the Sheriff's Department. Thus, in any given case there is only a slight possibility of criminal prosecution. Under these circumstances, CEU's notices violated § 1692e(4) and (5).

### E. Request for Payment of Illegal Fees

Gradisher next claims that CEU's demand for payment of the $25 Government Assessment Fee violated the FDCPA. Gradisher contends that CEU violated § 1692e(2)(A), which prohibits false representation of "the character, amount, or legal status of any debt," and § 1692f(1), which prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." Gradisher argues that CEU violated these provisions because there was never any determination that Gradisher acted with criminal intent to defraud and the Sheriff's Department was not involved with and did not have knowledge of the imposition of the Government Assessment Fee. In addition, Gradisher contends that imposition of the Government Assessment Fee without a hearing before an independent government official either before or after CEU attempts to collect the assessment constitutes a procedural due process violation under the Fourteenth Amendment, thus rendering the Government Assessment Fee invalid.

CEU contends that it did not violate § 1692f(1) because the Government Assessment Fee was imposed pursuant to a resolution passed by the Muskegon County Board of Commissioners in connection with the Muskegon County Check Violation Ordinance (the "Check Ordinance") and, therefore, the $25 fee was permitted by law. CEU cites *Tuttle v. Equifax Check,* 190 F.3d 9 (2d Cir.1999), in which the court held that a provision of Connecticut's version of the Uniform Commercial Code permitted the debt collector to impose and collect a $20 service charge for dishonored checks. The court reasoned that because statute permitted recovery of incidental damages by the seller or any person in the seller's position, the $20 charge did not violate § 1692f(1). *Id.* at 14–15.

■ As *Equifax Credit* demonstrates, the inquiry under § 1692f(1) is whether the charge sought by the debt collector is permitted by law. The answer in this case

---

**3.** CEU's "just stating the facts" argument must be rejected, because like the courts in *Davis* and *National Finance,* this court concludes that CEU was not simply intending to provide a public service to the recipients of its notices.

is yes. Section 4.A. of the Check Ordinance states: "Any person is liable for the expense of a dishonored check response, if such person, proximately causes any incident resulting in a dishonored check response." (Muskegon County Check Violation Ordinance § 4.A., Def.'s Mot. Summ. J. Ex. 1.) Section 4.C. states:

The expenses of a dishonored check response shall be a charge against the person liable for the expense under this ordinance. The charge constitutes a debt of that person and is collectible by the County of Muskegon for incurring those costs in the same manner as in the case of an obligation under a contract, expressed or implied.

(*Id.* § 4.C.) The Check Ordinance defines "expenses of a dishonored check response" as:

the direct and reasonable cost incurred by the County of Muskegon or to a private person or corporation operating at the request and direction of the County of Muskegon, when making a dishonored check response, including the cost of providing police, legal counsel and/or administrative services in response to any dishonored check. These costs further include all of the wages and salaries of the Muskegon County personnel, and/or contractors responding to the incident, all salaries and wages of the personnel and contractors engaged in investigations, supervision and report preparation, and all costs connected with the administration and provision of any prosecution of the person causing their incident.

(*Id.* § 2.C.) Under these provisions, a person who writes a dishonored check is liable for dishonored check charges, including the $25 fee the County adopted by resolution pursuant to the Check Ordinance.

Even though the $25 charge is permitted by statute, Gradisher makes a persuasive argument that the Government Assessment Fee is invalid because it is assessed against the check writer without affording a right to a hearing either before or after CEU attempts to collect it, and there is no provision for review by an independent government official before the check writer must pay the Government Assessment Fee. Collection of government-assessed fees similar to the fee in this case has been found to violate due process rights where no hearing is provided, often in the context of vehicle towing and impounding ordinances. *See Breath v. Cronvich*, 729 F.2d 1006, 1011 (5th Cir.1984)("When a car is towed or impounded, some form of fair and impartial hearing at which an owner is provided an opportunity to challenge the lawfulness of removing his car and assessing charges against him must be provided within a reasonable time period."). For example, in *Remm v. Landrieu*, 418 F.Supp. 542 (E.D.La.1976), the court held that a New Orleans ordinance that permitted towing of cars found to be violating traffic laws was unconstitutional because it authorized the imposition of towing and storage fees against the owners of the vehicles without providing notice and an opportunity for a hearing. *Id.* at 548. The Check Ordinance suffers from similar deficiencies because it provides for the imposition and collection of a government fee without providing the check writer an opportunity for a hearing before the fee is imposed. In other words, the Check Ordinance does not specifically provide a procedure for contesting the imposition of the Government Assessment Fee, nor was there notice of such a procedure in CEU's notices.

The issue before the court, however, is not whether the Check Ordinance is unconstitutional, but whether CEU violated the FDCPA. The question, thus, is: assuming that CEU attempted to collect a charge permitted by law, does a violation

still occur if the law is invalid? The answer to this question is no. *See Transamerica Fin. Servs., Inc. v. Sykes,* 171 F.3d 553 (7th Cir.1999). In *Sykes,* the plaintiff, Transamerica Financial Services, filed a mortgage foreclosure action in state court. The defendant alleged that the mortgage was a forgery, asserted counterclaims against Transamerica under the FDCPA and the Truth In Lending Act, and removed the case to federal court. The district court subsequently granted summary judgment to Transamerica on the federal claims and remanded the case to state court. The defendant appealed the dismissal of the FDCPA claim, contending that Transamerica's attorney, Nevel, violated § 1692f(1) because the mortgage was a forgery. The court rejected the argument, stating:

> [T]his section does not apply to Sykes' circumstances because Nevel never attempted to collect any debt not authorized by the agreement itself. Rather, he sought to collect a debt authorized by the agreement, the validity of the agreement notwithstanding. While attempting to enforce a fraudulent agreement may violate other laws, 15 U.S.C. § 1692f does not reach this action. Rather, this section applies to circumstances where debt collectors attempt to collect a fee for which the contract does not provide, or which is not authorized by law. The mortgage clearly authorizes the collection efforts undertaken by Nevel. That the mortgage may be a forgery has no bearing on the § 1692f analysis.

*Id.* at 555 (citation omitted). This court believes that the same reasoning applies here. In other words, the Check Ordinance permitted CEU to collect the Government Assessment Fee. While the Check Ordinance may be unconstitutional and subject to a claim under 42 U.S.C. § 1983, § 1692f is only concerned with whether the fee was permitted by law. "That the

[Check Ordinance] may be [unconstitutional] has no bearing on the § 1692f analysis." *Id.* Therefore, the court will deny Gradisher's motion for summary judgment on this claim.

## F. Use of False Representation or Deceptive Means

 Gradisher's final claim is that CEU violated § 1692e(10), which prohibits "[t]he use of any false representation or deceptive means to collect any debt or to obtain information concerning a consumer." A violation of § 1692e(5) also constitutes a violation of § 1692e(10). *United States v. Nat'l Fin. Servs., Inc.,* 98 F.3d 131, 138–39 (4th Cir.1996); *Greer v. Shapiro & Kreisman,* 152 F.Supp.2d 679, 686 (E.D.Pa.2001). Because the court has already concluded that CEU's notices violated § 1692e(4) and (5), Gradisher is also entitled to summary judgment on this claim.

## IV. *Conclusion*

For the foregoing reasons, the court will grant Gradisher's motion for partial summary judgment with respect to all claims except Gradisher's claim that CEU sought to collect illegal fees. Summary judgment will be granted to CEU on CEU's demand for payment of the $25 Government Assessment Fee. *See* Fed.R.Civ.P. 56(c).

An Order consistent with this Opinion will be entered.